**GIMIGLIANO MAURIELLO & MALONEY**
Stephen V. Gimigliano
Robert W. Mauriello, Jr.
Joshua A. Druck
A Professional Association
163 Madison Avenue, Suite 500
P.O. Box 1449
Morristown, New Jersey 07962-1449
(973) 946-8360
sgimigliano@lawgmm.com
rmauriello@lawgmm.com
jdruck@lawgmm.com

**CROWELL & MORING LLP**
Preetha Chakrabarti
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 223-4000
PChakrabarti@crowell.com

**CROWELL & MORING LLP**
Daniel A. Sasse
Tiffanie L. McDowell
3 Park Plaza, 20th Floor
Irvine, CA 92614
(949) 263-8400
DSasse@crowell.com
TMcDowell@crowell.com

*Attorneys for Plaintiffs Centene Corporation, Wellcare Health Plans, Inc., New York Quality Healthcare Corporation dba Fidelis Care, and Health Net, LLC*

(Additional Counsel for Plaintiffs listed on Signature Page)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CENTENE CORPORATION; WELLCARE HEALTH PLANS, INC.; NEW YORK QUALITY HEALTHCARE CORPORATION dba FIDELIS CARE; and HEALTH NET, LLC,

Plaintiff,

v.

MERCK & COMPANY, INC.; MERCK SHARP & DOHME CORPORATION; SCHERING-PLOUGH CORPORATION; SCHERING CORPORATION; and GLENMARK PHARMACEUTICALS LTD.,

Defendants.

Civil Action No. 2:23-cv-23033

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

JURY TRIAL DEMANDED

**TABLE OF CONTENTS**


I. BACKGROUND .....4
- A. Defendants' Anticompetitive Agreement and Impact on Vytorin. .....4
- B. Defendants' Monopolistic Conduct. .....7

II. LEGAL STANDARD .....8

III. ARGUMENT .....9
- A. Plaintiffs Have Standing to Recover Vytorin Damages. .....9
  1. Plaintiffs' Vytorin Damages Claim Cannot Properly be Resolved at the Pleading Stage. .....9
  2. Plaintiffs' Allegations Establish Antitrust Standing to Pursue Vytorin-Related Damages. .....12
  3. Plaintiffs' Vytorin Damages Were a Direct and Intended Consequence of Defendants' Conduct. .....21
  4. Plaintiffs Have Pled Facts Sufficient to Establish Standing as to the Other State Law Claims. .....24
- B. Plaintiffs Have Adequately Pled Plausible Monopolization Claims. .....27
  1. Plaintiffs Plausibly Allege that Merck Obtained the RE '721 Patent Through Fraud on the PTO. .....27
  2. Plaintiffs Plausibly Pled a Sham Litigation Claim. .....32
  3. Plaintiffs Adequately Allege that Defendants Misused the Orange Book for an Anticompetitive Purpose. .....33
  4. Plaintiffs Adequately Allege that Defendants Engaged in a Monopolistic Scheme. .....34
- C. Plaintiffs Adequately Allege that Merck and Schering Conspired to Monopolize the Market for Zetia .....35
- D. Plaintiffs' State Law Claims Are Adequately Pled. .....38
  1. Plaintiffs' State Law Claims are Properly Enumerated. .....38
  2. *Illinois Brick* Does Not Bar Plaintiffs' Montana Antitrust Claims. .....39
  3. Plaintiffs Have Standing to Assert Claims Under the Utah Antitrust Act. .....40
  4. Plaintiffs Have Adequately Pled Consumer Protection Claims Under the Laws of Colorado, North Dakota, Pennsylvania, and Wisconsin. .....41
  5. Plaintiffs' Claims Do Not Circumvent *Illinois Brick*. .....42

6. Plaintiffs Have Adequately Pled Mississippi and Missouri Consumer Protection Claims. ....45
7. Plaintiffs Have Adequately Pled Wyoming Consumer Protection Claims. ....48
IV. CONCLUSION ....49

# TABLE OF AUTHORITIES

## Cases

*Accord Westlake Servs., LLC v. Credit Acceptance Corp.*,
CV 15-07490, 2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ....32

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ....8

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
228 F.3d 429 (3d Cir. 2000) ....22

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .... *passim*

*Batton v. Nat'l Assoc. of Realtors*,
No. 21-cv-00430, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ....39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....8

*Berman v. ADT LLC*,
No. Civ. 12-7705, 2013 WL 6916891 (D.N.J. Dec. 13, 2013) ....10

*Bradburn Parent/Teacher Store, Inc. v. 3M (Minnesota Mining and Mfg. Co.)*,
No. CIV.A. 02-7676, 2000 WL 34003597 (E.D. Pa. July 25, 2003) ....10

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ....38

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010) ....25

*Cnty. of Cook v. Philip Morris, Inc.*,
353 Ill. App. 3d 55 (2004) ....25

*Connelly v. Lane Const. Corp.*,
809 F.3d 780 (3d Cir. 2016) ....8

*Copeland v. Treasure Chest Casino, L.L.C.*,
822 So.2d 68 (La. Ct. App. 2002) ....44

*Creamer v. Monumental Props., Inc.*,
459 Pa. 450 (1974) ....42

*Cromar Co. v. Nuclear Materials & Equip. Corp.*,
543 F.2d 501 (3d Cir. 1976) ....12

*de Atucha v. Commodity Exch., Inc.*,
608 F. Supp. 510 (S.D.N.Y. 1985) ....19

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) ....38

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ....29

*Ethypharm S.A. France v. Abbott Labs.*,
707 F.3d 223 (3d Cir. 2013) ....12

*Foglia v. Renal Ventures Mgmt., LLC*,
754 F.3d 153 (3d Cir. 2014) ....31

*Gibbons v. Nuckolls, Inc.*,
216 S.W. 3d 667 (Mo. 2007)....46

*Gregg v. Ameriprise Fin., Inc.*,
245 A.3d 637 (Pa. 2021)....42

*Hawaii Med. Ass'n. v. Haw. Med. Serv. Ass'n*,
148 P.3d 1179 (Haw. 2006)....25

*Ho v. Visa U.S.A., Inc.*,
787 N.Y.S.2d 677 (Sup. Ct. 2004)....25

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010)....35, 36, 37

*Hydril Co. LP v. Grant Prideco LP*,
474 F.3d 1344 (Fed. Cir. 2007)....29, 30

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224, 255 (D. Conn. 2015)....38, 39

*In re Aggrenox Antitrust Litig.*,
No. 3:14-md-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016)....44

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
433 F. Supp. 3d 395 (E.D.N.Y. 2020)....23

*In re Auto. Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014)....26

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
495 F. Supp. 2d 1027 (N.D. Cal. 2007)....46

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012)....42

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)....24

*In re Dynamic Random Access Memory (Dram) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007)....49

*In re Gabapentin Pat. Litig.*,
649 F. Supp. 2d 340 (D.N.J. 2009)....20, 34

*In re Generic Pharm. Pricing Antitrust Litig.*,
338 F. Supp. 3d 404 (E.D. Pa. 2018)....17, 42

*In re Generic Pharm. Pricing Antitrust Litig.*,
368 F. Supp. 3d 814 (E.D. Pa. 2019)....*passim*

*In re G-Fees Antitrust Litig.*,
584 F. Supp. 3d 26 (D.D.C. 2008)....45

*In re Linerboard Antitrust Litig.*,
203 F.R.D. 197 (E.D. Pa. 2001) *aff'd*, 305 F.3d 145 (3d Cir. 2002)....10

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017)....*passim*

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)....26

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) ....................22

*In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*,
190 So. 3d 829 (Miss. 2015) ....................48

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018) ....................24

*In re Neurontin Antitrust Litig.*,
MDL No. 1479, 2009 WL 2751029 (D.N.J. Aug. 28, 2009) ....................18

*In re Opana ER Antitrust Litig.*,
No. 14 C 10150, 2016 WL 4245516 (N.D. Ill. Aug. 11, 2016) ....................47

*In re Packaged Seafood Prod. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017) ....................43

*In re Processed Egg Prod. Antitrust Litig.*,
881 F.3d 262 (3d Cir. 2018) .................... 10, 12, 13

*In re Relafen Antitrust Litig.*,
225 F.R.D. 14 (D. Mass. 2004) ....................40

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
No. 13-MD-2445, 2017 WL 4910673 (E.D. Pa. Oct. 30, 2017) .................... 20, 37

*In re Sugar Indus. Antitrust Litig.*,
579 F.2d 13 (3d Cir. 1978) ....................11

*In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*,
No. 21-12061, 2023 WL 2182046 (D.N.J. Feb. 23, 2023) ....................39

*In re Warfarin Sodium Antitrust Litig.*,
214 F.3d 395 (3d Cir. 2000) ....................21

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
868 F.3d 132 (3d Cir. 2017) .................... 11, 17, 23, 33

*In re Zetia (Ezetimibe) Antitrust Litig.*,
No. 2:18-md-2836, 2019 WL 1397228 (E.D. Va. Feb. 6, 2019) ....................8, 43

*In re Zetia (Ezetimibe) Antitrust Litig.*,
No. 2:18-md-2836, 2020 WL 5778756 (E.D. Va. Aug. 14, 2020) ....................9

*Johnson v. Shelby*,
574 U.S. 10 (2014) ....................38

*Kanne v. Visa U.S.A., Inc.*,
272 Neb. 489 (2006) ....................25

*Kesling v. Hubler Nissan, Inc.*,
997 N.E.2d 327 (Ind. 2013) ....................44

*Knowles v. Visa U.S.A., Inc.*,
No. CIV.A. CV-03-707, 2004 WL 2475284 (Me. Super. Oct. 20, 2004) ....................25

*Laydon v. Mizuho Bank, Ltd.*,
No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ....................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ....................9

*Lifewatch Servs. Inc. v. Highmark Inc.*,
902 F.3d 323 (3d Cir. 2018) ....................................................................20

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) ..................................................................25

*Luscher v. Bayer AG*,
No. CV 2004-014835, 2005 WL 6959406 (Ariz. Super. Sept. 16, 2005) ...........25

*Missouri v. Polley*,
2 S.W.3d 887 (Mo. Ct. App. 1999) ............................................................46

*Monsanto Co. v. Bayer Bioscience N.V.*,
514 F.3d 1229 (Fed. Cir. 2008) .................................................................30

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*,
878 F.3d 1336 (Fed. Cir. 2018) .................................................................30

*Nass-Romero v. Visa U.S.A., Inc.*,
279 P.3d 772 (N.M. Ct. App. Jan. 25, 2019) ...............................................25

*Nevada Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*,
134 Nev. 463 (2018) ................................................................................25

*Novell, Inc. v. Microsoft Corp.*,
505 F.3d 302 (4th Cir. 2007) ................................................... 13, 22, 23

*Olson v. Microsoft Corp.*,
No. 2000-219, 2001 WL 36083237 (Mont. Dist. Ct. Feb. 15, 2001) ........... 39, 40

*Owens v. Corning v. R.J. Reynolds Tobacco Co.*,
868 So. 2d 331 (Miss. 2004) .....................................................................25

*Peterson v. Visa U.S.A., Inc.*,
No. CIV.A. 03-8080, 2005 WL 1403761 (D.C. Super. Apr. 22, 2005)...............25

*Picone v. Shire PLC*,
No. 16-cv-12396, 2017 WL 4873506 (D. Mass. Oct. 20, 2017) .........................47

*Polaris Indus. Inc. v. Arctic Cat Inc.*,
No. 14-3412, 2015 WL 4636544 (D. Minn. Aug. 4, 2015) .................................29

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980) ........................................................................18

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010)..........................................................44

*Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*,
No. 07-5295, 2008 WL 3833577 (D.N.J. Aug. 13, 2008) ............................ 21, 42

*Southard v. Visa U.S.A. Inc.*,
734 N.W.2d 192 (Iowa 2007)......................................................................25

*Staley v. Gilead Scis., Inc.*,
446 F. Supp. 3d 578 (N.D. Cal. 2020) .................................................. 38, 46, 47

*Staley v. Gilead Scis., Inc.*,
589 F. Supp. 3d 1132, 1144 (N.D. Cal. 2022) ......................................... 40, 44, 47

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
171 F.3d 912 (3d Cir. 1999) .......................................................................22

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
238 F. Supp. 3d 1032 (N.D. Ill. 2017), *aff'd*, 902 F.3d 735 (7th Cir. 2018)........26

*Swierkiewicz v. Sorema N.A*,
534 U.S. 506 (2002) ........................................................................................38

*Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn., Inc.*,
229 S.W.3d 304 (Tenn. Ct. App. 2007) ............................................................25

*Therasense, Inc. v. Becton, Dickinson and Co.*,
649 F.3d 1276 (Fed. Cir. 2011)........................................................................30

*Toscano v. PGA Tour, Inc.*,
201 F. Supp. 2d 1106 (E.D. Cal. 2002)............................................................19

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) ........................................................................................20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971) ........................................................................................18

**Other Authorities**

2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338a (2d ed. 2000) ..20

Federal Rule of Civil Procedure 15(a) ...............................................................32

Indiana Deceptive Consumer Sales Act...............................................................43

Mississippi Consumer Protection Act.................................................................45

Missouri Merchandising Practices Act ...............................................................45

Montana Unfair Trade Practices Act .................................................................39

N.D. Cent. Code § 51-15-02 ..............................................................................42

Utah Code § 76-10-3109.....................................................................................40

Wy. St. § 40-12-105(a)(xv)................................................................................48

Wyoming Unlawful Practices Act ......................................................................48

Merck[1] and Glenmark Pharmaceuticals Ltd. ("Glenmark," and with Merck, "Defendants") entered into an unlawful settlement agreement that shielded Merck's blockbuster cholesterol drugs—Zetia and Vytorin—from years of competition from less-expensive generic alternatives. As a result of Defendants' anticompetitive conduct, Humana Inc. ("Humana") and Centene[2] (collectively, "Plaintiffs") paid substantially higher prices for Zetia and Vytorin than they would have in a fair, competitive market. Defendants now seek to avoid the consequences of their unlawful conduct by asking the Court to dismiss Plaintiffs' claims based on lack of antitrust standing and failure to adequately plead monopolization theories and state law claims. But, Defendants have failed to justify dismissal.

*First*, Plaintiffs have standing to pursue their Vytorin damages. Defendants entered into a "pay-for-delay" agreement (the "PFD Agreement") that directly and purposefully prevented Plaintiffs and their members from accessing a less-expensive generic alternative to Vytorin that should have been available years earlier. *See* Centene Amended Complaint ¶¶ 94-98 ("CAC"); Humana Second Amended Complaint ¶¶ 96-100 ("HSAC," and together, the "Complaints"). Defendants insist

---

[1] The Merck Defendants are Merck & Company, Inc.; Merck Sharp & Dohme Corporation; Schering-Plough Corporation; Schering Corporation (collectively, "Merck").

[2] The Centene Plaintiffs are Centene Corporation, WellCare Health Plans, Inc., New York Quality Healthcare Corporation dba Fidelis Care, and Health Net, LLC (collectively, "Centene").

that Plaintiffs' Vytorin damages are "attenuated" and "speculative" because the Complaints do not specify the precise extent to which Plaintiffs' members would have switched to the generic alternative or what Plaintiffs would have done to encourage such switching. But, that level of detail exceeds what is required for notice pleading. The Complaints specifically allege that Plaintiffs could have leveraged a variety of drug utilization tools commonly used by health plans to encourage or mandate that costly prescriptions for Vytorin be replaced with a two-pill regimen of generic ezetimibe and generic simvastatin, at a dramatically lower cost.[3] CAC ¶¶ 39, 160; HSAC ¶¶ 41, 162. Because a two-pill regimen was the norm before Merck secured dubious patent protection for Zetia, prescribers were well-acquainted with this treatment. CAC ¶¶ 142-46; HSAC ¶¶ 144-148. These allegations must be accepted as true for purposes of the present Motion. And they support a plausible inference that at least some of Plaintiffs' members would have reverted to the much more economical two-pill regimen if not for Defendants' anticompetitive conduct, thereby causing a plausible antitrust injury to Plaintiffs. This is sufficient to establish antitrust standing.

*Second*, Plaintiffs have adequately pled each of the monopolization theories they alleged. While not attacking the reverse payment aspect of those theories,

[3] Plaintiffs acknowledge that they are pursuing only the two-pill switching theory, and not an automatic AB-rated generic Vytorin switch theory.

Defendants move to dismiss Plaintiffs' well-pled monopolization and monopolistic scheme claims based on: (i) Merck defrauding the U.S. Patent and Trademark Office ("PTO") during prosecution of U.S. Patent No. RE37,721 (the "RE '721 patent"); (ii) Merck listing patents in the Orange Book that they knew were invalid, unenforceable, or did not cover Zetia and Vytorin; (iii) Merck asserting the invalid/unenforceable RE '721 patent against Glenmark in patent litigation; and (iv) Merck and Glenmark entering into the PFD Agreement to resolve that litigation. Plaintiffs detailed allegations easily satisfy even the heightened pleading standard applicable to fraud-based claims such as these.

*Third*, the Complaints contain detailed and concrete factual allegations that are more than sufficient to establish not only that Merck and Schering had a common interest in monopolizing the markets for Zetia and Vytorin, but also that they worked in concert toward achieving their monopolistic goals even prior to formally merging.

*Fourth*, Plaintiffs have adequately stated a claim under each of the state law-based causes of action asserted in the Complaints.

Accordingly, the Court should deny Defendants' Motion.[4]

---

[4] Two issues raised in the Motion are well-taken. Plaintiffs are indeed bound by the MDL court's dismissal of the theory that the PFD Agreement was *per se* unlawful and that their claims are governed by the rule of reason. *See* Mot. at 23. Plaintiffs also stipulated to be bound by the MDL court's dismissal of certain state law claims, *see* Mot. at 43, and do not oppose dismissal of those claims here. However, Plaintiffs do not concede the correctness of either ruling by the MDL court.

# I. BACKGROUND

## A. Defendants' Anticompetitive Agreement and Impact on Vytorin.

Merck has developed and marketed several blockbuster cholesterol-reducing drugs, two of which are at issue here. The first is ezetimibe, a drug marketed by Merck under the brand name Zetia. Ezetimibe represented a significant advance in cholesterol-fighting drugs because it worked differently than statins, the class of medication typically used as a first-line treatment for high cholesterol. *See* CAC ¶¶ 55, 60; HSAC ¶¶ 57, 62. The second is simply a fixed-dose combination of ezetimibe and a statin called simvastatin, which Merck marketed under the brand name Vytorin. CAC ¶ 62; HSAC ¶ 64. Zetia and Vytorin were both extremely successful for Merck, with each consistently generating more than $1 billion in annual sales (and more than $2 billion in some years). *See* CAC ¶ 2; HSAC ¶ 2.

Given the popularity of Merck's products, on October 25, 2006, Glenmark filed an Abbreviated New Drug Application ("ANDA") with the FDA seeking approval to market and sell a generic version of Zetia. CAC ¶¶ 3, 83; HSAC ¶¶ 3, 85. Glenmark's ANDA contained a "Paragraph IV certification" that its generic product would not infringe Merck's patents because they were either invalid or would expire before Glenmark launched its generic alternative. CAC ¶ 83; HSAC ¶ 85. Because Glenmark was the first generic manufacturer to file an ANDA, it was

entitled to 180-days of exclusivity following the launch of its generic version of Zetia. *See* CAC ¶ 32; HSAC ¶ 34.

In response to Glenmark's ANDA filing, Merck sued Glenmark in March 2007, alleging Glenmark's generic version of Zetia would infringe the RE '721 patent, which was not set to expire until April 25, 2017. CAC ¶ 84; HSAC ¶ 86. Glenmark asserted several meritorious affirmative defenses and counterclaims, and the parties litigated the patent dispute for roughly three years. *See* CAC ¶¶ 4, 85-92; HSAC ¶¶ 4, 87-94. On the eve of trial, Merck and Glenmark entered into the PFD Agreement. CAC ¶ 97; HSAC ¶ 99. Glenmark dropped its attacks against the RE '721 patent and agreed not to launch a generic version of Zetia until December 12, 2016—only 4.5 months before the patent expired. CAC ¶ 112; HSAC ¶ 114. In exchange, Merck agreed not to compete with Glenmark during its 180-day exclusivity period by launching an "authorized generic" (a generic version of a drug sold by the brand manufacturer)—a promise that was worth millions to Glenmark. CAC ¶¶ 112-115; HSAC ¶¶ 114-117.

Plaintiffs allege that the PFD Agreement was anticompetitive because absent Merck's agreement to forego launching an authorized generic, Glenmark would have insisted upon a much earlier entry date in light of its likelihood of prevailing in the patent litigation. CAC ¶¶ 119-125; HSAC ¶¶ 121-127. The PFD Agreement delayed the introduction of lower-cost generic versions of Zetia, forcing Plaintiffs to

continue paying for the higher-cost brand version. CAC ¶ 6; HSAC ¶ 6. Except for Defendants challenging the sufficiency of Plaintiffs' pleadings under particular state laws, these Zetia-related allegations are generally not at issue here.

Plaintiffs also allege that the PFD Agreement, by delaying the introduction of generic ezetimibe, prevented at least some patients taking Vytorin from switching to a less-expensive, two-pill treatment of generic ezetimibe and generic simvastatin. CAC ¶ 7; HSAC ¶ 7. While this would have involved patients switching from a single Vytorin pill to a combination of an ezetimibe pill and a simvastatin pill (as was the norm before Merck launched its combination pill), some of Plaintiffs' members would have made this switch, and thus Plaintiffs would have realized substantial cost savings. CAC ¶¶ 7, 153; HSAC ¶ 7, 155.

The Complaints explain that Plaintiffs were able to use a variety of tools to "encourage the substitution of lower cost generic drugs instead of their branded counterparts." CAC ¶ 39; HSAC ¶ 41. Plaintiffs further allege that "[h]ad generic Zetia become available before generic Vytorin, [Plaintiffs] would have investigated the financial implications of mandating [their] members switch from branded Vytorin to generic ezetimibe and simvastatin and could have utilized mechanisms, such as formulary tier placement, [step therapy, and prior authorization] to encourage and/or require members to substitute single-pill branded Vytorin for a two-pill regime of generic Zetia and simvastatin." CAC ¶ 160; HSAC ¶ 162.

**B. Defendants' Monopolistic Conduct.**

The Complaints allege that Merck engaged in anticompetitive conduct to unlawfully obtain and extend its monopoly over Zetia and Vytorin. CAC ¶¶ 149-153; HSAC ¶ 151-155. This conduct included fraudulently prosecuting the RE '721 patent it asserted against Glenmark, knowing that (1) the claims that issued were invalid due to inherent anticipation by International Patent Application WO 93/02048 ("WO'048"), as evidenced by studies known to Merck at the time but not disclosed to the PTO; and (2) Merck had failed to name one of the proper inventors on the patent. CAC ¶¶ 64-68, 74, 88-92, 99-101, 123, 132, 181; HSAC ¶¶ 66-70, 76, 90-94, 101-103, 125, 134, 183. Merck performed these acts knowingly, with intent to deceive the PTO. *Id.* Merck's unlawful conduct also included improper listings of patents in the Orange Book: (1) listing U.S. Patent No. 5,846,966 (the "'966 patent") for Zetia while knowing the patent only covered Zetia plus a statin, not Zetia alone; (2) listing the RE '721 patent for Zetia and Vytorin knowing the patent was invalid and unenforceable; and (3) listing U.S. Patent No. 7,030,106 (the "'106" patent) for Zetia knowing it was invalid in view of the RE '721 patent. CAC ¶¶ 69-80; HSAC ¶¶ 71-82. Merck's misconduct further included asserting its invalid/unenforceable patent against Glenmark in order to maintain its ezetimibe monopoly. CAC ¶¶ 83-102; HSAC ¶¶ 85-104. Finally, the unlawful conduct includes the anticompetitive PFD Agreement with Glenmark. CAC ¶¶ 100-118; HSAC ¶¶ 102-120. Each of these

actions contributed to an overarching monopolistic scheme intended to delay generic competition for Zetia and Vytorin. CAC ¶¶ 149-153; HSAC ¶ 151-155.

## II. LEGAL STANDARD

A complaint may be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it fails "to state a claim upon which relief can be granted," but "detailed pleading is not generally required." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). "The Rules demand only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In evaluating the allegations of a plaintiff's complaint, the court must "accept all factual allegations in the complaint as true and, examining for plausibility, determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017). "'In antitrust cases in particular . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2019 WL 1397228, at *11 (E.D. Va. Feb. 6, 2019) (quoting *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144 (4th Cir. 1990) (internal quotation omitted)), *report and recommendation adopted as modified*, 400 F. Supp. 3d 418 (E.D. Va. 2019).

## III. ARGUMENT

### A. Plaintiffs Have Standing to Recover Vytorin Damages.

#### 1. Plaintiffs' Vytorin Damages Claims Cannot Properly be Resolved at the Pleading Stage.

To seek damages for their federal and state law claims, Plaintiffs need only show they suffered an injury that was proximately caused by an antitrust violation. *See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 126, 132-33 (2014). Payment of a single overcharge is enough to establish antitrust injury and confer standing. *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2020 WL 5778756, at *18 (E.D. Va. Aug. 14, 2020).

Here, Plaintiffs adequately allege that Defendants entered into the PFD Agreement for the anticompetitive purpose of delaying the introduction of generic ezetimibe into the market. The sufficiency of Plaintiffs' allegations regarding the PFD Agreement is not in dispute. *See* Mot. at 11 n.7. Plaintiffs also allege they suffered injuries proximately caused by Defendants' antitrust violation—they were prevented from replacing costly brand Zetia with a less-expensive generic ezetimibe and replacing costly brand Vytorin with a less-expensive combination of generic ezetimibe and generic simvastatin. CAC ¶¶ 153, 157, 159-161; HSAC ¶¶ 155, 159, 161-163. Plaintiffs' demand for damages associated with overpayments they made for Vytorin is not a standalone claim, but rather are injuries that arise directly from the same antitrust violations Plaintiffs allege with respect to Zetia. *See* CAC ¶¶ 153,

161; HSAC ¶¶ 155, 163. Plaintiffs have thus provided Defendants with adequate notice of the basis for their claims, both as to liability and damages. *Bradburn Parent/Teacher Store, Inc. v. 3M (Minnesota Mining and Mfg. Co.)*, No. CIV.A. 02-7676, 2000 WL 34003597, at *2 (E.D. Pa. July 25, 2003) ("Notice pleading is all that is required for a valid antitrust complaint." (citations and quotations marks omitted)); s*ee also Berman v. ADT LLC,* No. Civ. 12-7705, 2013 WL 6916891, at *8 (D.N.J. Dec. 13, 2013) ("It is inappropriate for the Court to wade into factual issues, such as the measure of Plaintiffs' damages, on a motion to dismiss."). On this basis alone, the Court should deny Defendants' Motion as to Vytorin damages.

Dismissing Plaintiffs' Vytorin theories at this early stage would conflict with a long history of courts in the Third Circuit finding antitrust standing where a defendant's anticompetitive conduct was aimed at increasing the price of a component of another product, as is the case here. *See In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d 262, 273-74 (3d Cir. 2018) (finding plaintiffs had antitrust standing to seek damages for overcharges for egg products made with eggs subject to defendants' alleged price-fixing scheme); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 216 (E.D. Pa. 2001) (finding plaintiffs alleged sufficient facts "to support their claims that a conspiracy to reduce the supply of linerboard raised the prices of corrugated products"), *aff'd*, 305 F.3d 145 (3d Cir. 2002); *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 19 (3d Cir. 1978) ("[T]o deny recovery [here] ...

would leave a gaping hole in the administration of the antitrust laws ... [by] allow[ing] the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product."). In this case, Merck used the PFD Agreement to unlawfully extend its monopoly over ezetimibe, enabling it to continue charging supracompetitive prices for Vytorin. Denying standing would undermine the public policy objectives of deterring violations, compensating victims, and depriving violators of illicit profits.

Moreover, many of the cases that Defendants cite in support of their standing arguments involved summary judgment motions and suggest that resolving issues of antitrust standing is more appropriate later in the proceedings. *See, e.g.,* Mot. at 20 (citing *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163-64 (3d Cir. 2017), where the Third Circuit observed that "antitrust standing is more properly viewed as an element of an antitrust claim that can be resolved at summary judgment").

Even the MDL court doubted the appropriateness of deciding the question of standing to pursue Vytorin damages at the pleading stage:

> I'm really wondering why we're dealing with this at 12(b)(6) and not at summary judgment. And I know you said that this is a standing question, but there's no doubt about their standing. I mean, they clearly have standing because they have Zetia claims. So they're going to stay here. And I don't understand why we don't just say this is a damages question, United has standing, we're going to sort this out after some discovery and see what their damages are; whether their expert can say

> whether there was any harm from Vytorin and on what basis their expert says that.

Defendants' Ex. E, MDL Jan. 27, 2022 Hr'g Tr. at 26:18-27:7. Defendants' attempt to resolve Plaintiffs' Vytorin damages theory on the pleadings is thus premature.

### 2. Plaintiffs' Allegations Establish Antitrust Standing to Pursue Vytorin-Related Damages.

Antitrust standing "is conceptually difficult and has not been delineated with precision." *Egg Prod.*, 881 F.3d at 268. The analysis aims to determine whether the plaintiff is among "those individuals whose protection is the fundamental purpose of the antitrust laws." *Id.* at 269 (quoting *Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 505 (3d Cir. 1976)). "There is no bright-line test." *Id.* Instead, courts in the Third Circuit weigh five factors, drawn from the Supreme Court's decision in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") to determine standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Id*. (citing *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232-33 (3d Cir. 2013)).

While Defendants invoke *AGC* as a basis to dismiss Plaintiffs' claim for Vytorin damages, they misapply the precedent by addressing only two of the five factors—"causal connection" and "directness"—which Defendants erroneously collapse into a general proximate causation requirement. *See* Mot. at 14-15. Yet neither factor favors dismissal here because the Complaints plausibly establish that Plaintiffs' overpayments for Vytorin were a direct consequence of Defendants' anticompetitive conduct.

**a. Plaintiffs Allege a Clear and Direct Causal Connection Between Defendants' Conduct and Their Vytorin Injuries.**

Plaintiffs satisfied the first *AGC* factor by alleging a clear causal connection between Defendants' antitrust violations (*e.g.*, entering into the unlawful PFD Agreement) and the harm Plaintiffs suffered (*i.e.*, paying higher prices for brand drugs due to the absence of generic competition), and that Defendants intended that harm. *See Egg Prod.*, 881 F.3d at 275; *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007).

Plaintiffs allege that Defendants violated the antitrust laws by entering into an anticompetitive settlement agreement where Glenmark agreed to a later entry date for its generic ezetimibe product in exchange for Merck's agreement not to launch a competing authorized generic during Glenmark's 180-day exclusivity period. *See* CAC ¶ 5; HSAC ¶ 5. Plaintiffs also allege that Defendants' conduct was the direct

cause of significant financial injuries, because at least some of Plaintiffs' members would have taken a less-expensive combination of generic ezetimibe and generic simvastatin instead of branded Vytorin if generic ezetimibe had been available earlier. *See* CAC ¶¶ 6, 153, 157; HSAC ¶¶ 6, 155, 159. Instead, Plaintiffs continued to pay for Merck's higher-priced branded product, costing them hundreds of millions of dollars. *See* CAC ¶ 6; HSAC ¶ 6.

Plaintiffs also specifically allege their injuries were precisely the intended consequence of Defendants' anticompetitive conduct. CAC ¶ 149; HSAC ¶ 151. Defendants' intent to shield both Zetia *and Vytorin* from generic competition is amply supported by factual allegations in the Complaints. For instance, Plaintiffs allege that Merck knew during negotiation of the PFD Agreement that Glenmark's challenge to the RE '721 patent threatened its Vytorin exclusivity too. CAC ¶ 96; HSAC ¶ 98. In a 2009 email, Glenmark's lead negotiator summarized a settlement meeting as follows: "While I did bring the matter of near future and also reminded [Schering Plough's General Counsel] of the fact that +ve [sic] court decision in favor of Glenmark *will impact Vytorin product*." *Id*. (emphasis added). These well-pled allegations satisfy the "causal connection" factor of *AGC*.

Defendants incorrectly argue the causal relationship between their misconduct and Plaintiffs' Vytorin-related injuries is too "attenuated" and "speculative" to support standing. However, Plaintiffs' Vytorin damages are predicated on the exact

same distribution channel as their Zetia damages, and the causal chain is virtually identical. But for the unlawful conduct, lower-cost generic alternatives would have been available and consequently Plaintiffs would have either excluded Vytorin from coverage or placed it on a higher formulary tier to financially incentivize members to switch. This is sufficient to establish *prima facie* proximate cause because the lack of choice imposed on Plaintiffs (and other purchasers/payors) was the known and intended consequence of the PFD Agreement.

Defendants assert that Plaintiffs' Vytorin-related injuries are too remote because there are intervening factors that allegedly break the chain of causation. Mot. at 16. But, these factors are present in every pharmaceutical pay-for-delay case. For example, even in a single-pill branded to AB-rated generic switch scenario, health plans assess the financial implications of covering a generic alternative as it becomes available and take affirmative steps to provide coverage of the generic by adding it to formularies and assigning it to tiers. The fact that Plaintiffs would have considered whether to use drug utilization tools such as prior authorization requirements, step-edit policies, and formulary placement to encourage members to take two non-AB rated generic pills instead of branded Vytorin does not add a step to the causal chain. Likewise, physicians are still making decisions as to which drugs to prescribe in the single-pill switch scenario. And, if for some reason it is more cost-effective for a patient to take a branded drug rather than an AB-rated generic, a

physician may direct the branded drug to be dispensed. A physician's ability to make prescribing decisions in the Vytorin-related scenario thus does not break the causal chain.

As Plaintiffs allege, if they used their drug utilization management tools to make two non-AB rated generic pills less costly for members than branded Vytorin, physicians would have adjusted their prescribing habits, essentially reverting back to the two-pill treatment regimen that existed before Merck launched Vytorin. *See* CAC ¶¶ 39, 62; HSAC ¶¶ 41, 64. Moreover, even if some physicians continued to prescribe branded Vytorin, this would not have disrupted the causal chain because Plaintiffs, like other plans, could have refused to pay for the branded drug by taking it off of their formularies or adding step-edits or prior authorization requirements. *See* CAC ¶ 39; HSAC ¶ 41. Indeed, the MDL Court recognized as much. *See, e.g.*, Defendants' Ex. E, MDL Jan. 27, 2022 Hr'g Tr. at 21:21-23 ("[A plan] could just say we ain't paying for it anymore. Or if you want to stay on Vytorin, you're going to pay 75 bucks a co-pay.").

Contrary to Defendants' contentions, the fact that Plaintiffs did not allege that they investigated the financial implications of converting Vytorin patients to a two-pill generic version when generic ezetimibe launched in December 2016 does not diminish the plausibility of Plaintiffs' allegations. Mot. at 17. Glenmark's delayed launch was only 4.5 months before generic Vytorin became available. This short

period of potential savings presented a markedly lower incentive to explore a possible conversion strategy than a scenario in which Plaintiffs could have realized years' worth of savings. Moreover, that 4.5-month period fell within Glenmark's 180-day exclusivity. Since no other company could sell generic ezetimibe during that period, and Merck had unlawfully agreed not to launch an authorized generic, Glenmark was able to price its product at only a 20% discount off the brand price. CAC ¶ 131; HSAC ¶ 133.

Defendants also complain that Plaintiffs did not specify which drug utilization policy(ies) they would have used, or the precise amount of switching to the two-pill regimen that would have occurred. Mot. at 16-18. But how effective Plaintiffs would have been in encouraging their members to switch to a generic alternative to Vytorin are factual issues that go to the quantum of Plaintiffs' damages, not the directness of their injury, and thus are more appropriately evaluated following discovery. *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 457-58 (E.D. Pa. 2018) (observing that "'antitrust standing is more properly viewed as an element of an antitrust claim that can be resolved at summary judgment'"). (quoting *Wellbutrin*, 868 F.3d at 164). At the pleading stage, Plaintiffs need only allege that generic ezetimibe and generic simvastatin could have taken at least some sales away from Vytorin if that combination was an available alternative before December 12, 2016. *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2009 WL 2751029, at *11 (D.N.J.

Aug. 28, 2009) ("an antitrust plaintiff may establish antitrust injury with 'proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the *amount* and not the *fact* of damage'" (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)) (emphasis added)). Plaintiffs have done so. *See* CAC ¶¶ 153, 160; HSAC ¶¶ 155, 162.

Defendants rely on multiple cases that are not analogous to Plaintiffs' allegations here and do not advance their argument that Plaintiffs' Vytorin damages are too attenuated or indirect. *See* Mot. at 15-16. *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980) involved review of a summary judgment decision in favor of the defendants after the plaintiff presented a "somewhat bizarre attempt to obtain damages under the antitrust laws." The plaintiff accused defendants of manipulating the price of refined copper which, through "a complicated series of market interactions," allegedly caused increases in the price of copper scrap—an entirely separate product market. *Id.* Unlike here, the plaintiff in *Reading* asserted standing as a *competitor* of the defendants and "did not allege that it ever purchased or sought to purchase refined copper from defendants." *Id.* at 12. Plaintiffs' straightforward allegations here—that they overpaid for Defendants' products due to Defendants' scheme to delay competition to those products—bear no resemblance to the convoluted theory asserted in *Reading*.

Defendants' other cases similarly involve distinguishable fact patterns, including additional cases concerning manipulation of commodity prices and benchmark rates where the asserted theories of harm depended on "numerous complex transactions." *See de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 515-16 (S.D.N.Y. 1985) (losses on the London Metals Exchange allegedly caused by manipulation of U.S. silver markets were too attenuated because there was no indication the markets interacted); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014) (financial losses on futures contracts allegedly caused by manipulation of present interbank lending rates was too attenuated). Another case Defendants cite, *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1116-17 (E.D. Cal. 2002), is even further afield and involved allegations by a professional golfer that PGA rules prevented competition from rival professional tours, in which the plaintiff alleged he could have competed and won prize money. The mere existence of such rival tour events was hypothetical, as was the plaintiff's eligibility to compete, let alone win prize money. *Id.* at 1117. In stark contrast, Plaintiffs' overcharges for Vytorin in this case were a direct result of Defendants' anticompetitive agreement to delay entry of generic ezetimibe, a tangible product that would have been available for purchase if not for Defendants' unlawful conduct.

Moreover, Plaintiffs are not required to discredit all possible intervening factors that contributed to their injury, particularly at the pleading stage. *See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4910673, at *11 (E.D. Pa. Oct. 30, 2017) (citing *In re Gabapentin Pat. Litig.*, 649 F. Supp. 2d 340, 346 (D.N.J. 2009) (plaintiff was not required to "completely discredit in its initial pleadings all possible intervening causes" of its injury)). Instead, Plaintiffs "need only show that a violation is a 'material cause' of the claimed injury." *Id.* (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969)). "[T]o require proof that the illegal conduct was the *exclusive* cause of the plaintiff's injury" would "effectively deny private remedies, because multiple causes always affect everyone." *Id.* (citing 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338a at 317 (2d ed. 2000)).

In any event, the mere presence of some intervening causes does not compel a finding that Plaintiffs' Vytorin damages are too indirect or remote. For example, in *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 342 (3d Cir. 2018), the Third Circuit held that the plaintiff, a seller of telemetry monitors, had standing to assert antitrust claims against defendants accused of colluding to deny coverage for the plaintiffs' devices. Reversing the district court's dismissal of the plaintiff's claims, the Third Circuit explained that the presence of intervening factors such as "the [health plan's] independent ability to deny coverage of telemetry monitors, a

doctor's choice not to prescribe telemetry monitors, and a patient's desire for alternative treatments" did not sever the causal chain or render the plaintiff's injuries too speculative. *Id.* Other courts in this Circuit have similarly found that antitrust standing can lie despite the existence of potential intervening factors. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) (plaintiff had antitrust standing "[r]egardless of the existence of the various links of middlemen" because the excess amounts paid for the defendant's product was the alleged aim of the defendant's anticompetitive conduct); *accord Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*, No. 07-5295, 2008 WL 3833577, at *12 (D.N.J. Aug. 13, 2008) (holding that purported "intervening factors" did not render health plans' injuries "too attenuated to confer standing"). In *Sheet Metal*, the court concluded that the defendants' remoteness argument based on asserted "intervening factors" was "premature, and if at all, appropriate for consideration on a motion for summary judgment." 2008 WL 3833577, at *12. The same is true here.

### 3. Plaintiffs' Vytorin Damages Were a Direct and Intended Consequence of Defendants' Conduct.

Defendants further challenge Plaintiffs' standing to pursue Vytorin damages on the grounds that they are not sufficiently "direct." According to Defendants, Plaintiffs do not allege that Vytorin was the "target" of the PFD Agreement. Mot. at 19-22. Defendants are wrong.

First, none of the cases cited by Defendants require that Defendants' anticompetitive conduct specifically "targeted" Vytorin. *Novell*, 505 F.3d at 316-17, for example, does not require a plaintiff to allege a defendant consciously "targeted" the product at issue. At most, *Novell* stands for the proposition that allegations regarding a defendants' specific intent may suffice to establish standing, but they are not necessary. Defendants also cite *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167-68 (3d Cir. 1993) which merely articulates the same issues of causation and "directness" applied in the *AGC* analysis—it does not establish a distinct "targeting" requirement.

Defendants also rely on *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999) and *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000), cases involving claims by health plans and hospitals against tobacco companies accused of deceiving the public about the risks of smoking. In those cases, the Third Circuit tested the plaintiffs' standing by asking whether their injuries were "integral" to the alleged anticompetitive scheme, ultimately finding that it was not integral to the tobacco companies' misinformation campaigns that health plans or hospitals incur higher costs for medical treatment of smokers. *See Allegheny*, 228 F.3d at 437-38. By contrast, there is no real question here that extending the period of time that Plaintiffs overpaid for brand Vytorin was integral to Defendants' plan to delay generic competition.

Second, even if Plaintiffs were required to allege that Vytorin was the "target" of Defendants' alleged anticompetitive conduct, they have done so. The RE '721 patent, which was the subject of the patent infringement suit between Glenmark and Merck that was settled by the PFD Agreement, protected Zetia *and Vytorin*. *See* Defendants' Ex. E, MDL Jan. 27, 2022 Hr'g Tr. at 15:7-21, 16:16-17:1, 51:10-15. As noted above, the Complaints also describe communications between Defendants during negotiations preceding the PFD Agreement which confirm their awareness that Vytorin's exclusivity was also threatened by the litigation. CAC ¶ 96; HSAC ¶ 98. Similar types of communications are highlighted in Defendants' own cases. *See Novell*, 505 F.3d at 317. And while Defendants cite *Wellbutrin* as requiring Plaintiffs to plead that increased drug prices for the brand product were caused by the complained-of settlement agreement, Mot. at 20, Plaintiffs do exactly that. *See, e.g.*, CAC ¶ 157; HSAC ¶ 159.

Third, the cases Defendants cite are factually inapposite. In *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395 (E.D.N.Y. 2020) ("*Amex*"), the court expressly noted that case was factually distinguishable from a reverse-payment case, concluding that purchasers who allegedly paid higher prices for a generic drug because manufacturers restricted and manipulated generic competition by entering into reverse-payment agreements presented a "more direct injury" than the *Amex* plaintiffs alleged. *Amex*, 433 F. Supp at 410 (discussing *In re Namenda*

*Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018)). Defendants also cite *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 397 (S.D.N.Y. 2011), a case where plaintiffs asserted overcharges on products in derivative markets bearing little or no connection to the defendants' conduct. *Id*. at 404-405 (alleged price fixing for "internet music" lacked a sufficiently direct relationship to alleged overpayments for CDs). Here, Plaintiffs allege that Vytorin was directly impacted by the unlawful PFD Agreement. CAC ¶¶ 149-153; HSAC ¶¶ 151-155.

#### 4. Plaintiffs Have Pled Facts Sufficient to Establish Standing as to the Other State Law Claims.

Defendants contend their standing arguments based on federal antitrust law also compel dismissal of all of Plaintiffs' Vytorin claims under state law, including Plaintiffs' claims under state consumer protection statutes and common law unjust enrichment claims. Mot. at 14 n.8, 22-23. Defendants' sweeping contention that *AGC* and its progeny set the standard for different statutes and causes of actions across dozens of different jurisdictions is unfounded.

***State Antitrust Claims***. In a footnote, Defendants declare that *AGC* or similar federal antitrust standing principles apply to claims under the antitrust statutes of 28 state jurisdictions. Mot. at 14 n.8. Defendants provide no explanation or analysis in support of this assertion, and instead refer Plaintiffs and the Court to an "appendix" of cases purportedly reflecting application of *AGC* "or similar proximate causation principles" to antitrust claims under various state's laws. *Id.*

Most of the cases cited in Defendants' appendix are not state-specific decisions or binding on this Court. *See* Mot. at 46-48. At most, the cited cases indicate that three state high courts, one intermediate state appellate court, and three state trial courts have affirmatively concluded that their high courts do or would apply the *AGC* standard[5]—even though Defendants are asking this Court to strike claims under 28 different state's laws. The remaining cases "speak only to general notions of 'remoteness' or proximate cause which, although consistent with *AGC*, are more expansive concepts than *AGC's* five carefully delineated factors."[6] *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 4955377, at *9

[5] *See Luscher v. Bayer AG*, No. CV 2004-014835, 2005 WL 6959406, at *1 (Ariz. Super. Sept. 16, 2005) (Arizona trial court); *Peterson v. Visa U.S.A., Inc.*, No. CIV.A. 03-8080, 2005 WL 1403761, at *2-6 (D.C. Super. Apr. 22, 2005) (D.C. trial court); *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 198-99 (Iowa 2007) (Iowa high court); *Knowles v. Visa U.S.A., Inc.*, No. CIV.A. CV-03-707, 2004 WL 2475284, at *5 (Me. Super. Oct. 20, 2004) (Maine trial court); *Kanne v. Visa U.S.A., Inc.*, 272 Neb. 489, 494-95 (2006) (Nebraska high court); *Nevada Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*, 134 Nev. 463, 465-66 (2018) (Nevada high court); *Nass-Romero v. Visa U.S.A., Inc.*, 279 P.3d 772, 778-81 (N.M. Ct. App. Jan. 25, 2019) (New Mexico intermediate appellate court).

[6] *See Hawaii Med. Ass'n. v. Haw. Med. Serv. Ass'n*, 148 P.3d 1179, 1210 (Haw. 2006) (non-derivative injury); *Owens v. Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 343-44 (Miss. 2004) (remoteness); *Cnty. of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 66 (2004) (same); *Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn., Inc.*, 229 S.W.3d 304, 310-11 (Tenn. Ct. App. 2007) (proximate cause); *Ho v. Visa U.S.A., Inc.*, 787 N.Y.S.2d 677, at *5 (Sup. Ct. 2004); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 774 (2010). Additionally, the Minnesota Supreme Court has specifically declined to apply *AGC* to Minnesota's antitrust law, instead articulating a loose proximate cause test. *See Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627 (Minn. 2007).

(N.D. Cal. Oct. 2, 2014). There is no reasonable basis to conclude that the courts in these cases broadly adopted *AGC* or any other federal principles of antitrust standing and proximate causation.

***State Consumer Protection & Unjust Enrichment Claims.*** Defendants argue further that Plaintiffs cannot satisfy the proximate cause requirement for their state law consumer protection and unjust enrichment claims. Mot. at 22-23. Although Defendants rely on a few cherry-picked cases to support the notion that *every* state's consumer protection and unjust enrichment statutes use the same test as *AGC*, these cases only address half of the states under which Plaintiffs bring consumer protection and unjust enrichment claims. *See e.g.*, *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1041 n.6 (N.D. Ill. 2017), *aff'd*, 902 F.3d 735 (7th Cir. 2018). And Defendants do not even attempt to address nuanced precedent finding that such claims are subject to less stringent but-for causation requirements. This alone should be fatal to their argument. Regardless, even for state consumer protection and unjust enrichment claims that may be subject to causation requirements similar to *AGC*, Plaintiffs have plausibly pled this element for the same reasons they have plausibly pled antitrust claims. *See In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1012 (E.D. Mich. 2014) (refusing to dismiss state consumer protection claims on remoteness grounds where *AGC* was satisfied for antitrust claims).

### B. Plaintiffs Have Pled Plausible Monopolization Claims.

As detailed in Section I.B. above, Plaintiffs allege that Defendants monopolized the market for ezetimibe drugs by committing fraud on the PTO during prosecution of their patents covering ezetimibe, by misusing the Orange Book, and by pursuing a baseless infringement suit against Glenmark that was eventually resolved through the anticompetitive PFD Agreement. Defendants have failed to justify disposing of these claims on the pleadings.

#### 1. Plaintiffs Plausibly Allege that Merck Obtained the RE ’721 Patent Through Fraud on the PTO.

Plaintiffs allege two fraudulent actions related to prosecution of the RE ’721 patent: (1) that Merck knowingly failed to disclose invalidating prior art to the PTO, and (2) that Merck intentionally failed to name one of the true inventors of the patent—both of which rendered the patent invalid and unenforceable. *See, e.g.,* CAC ¶¶ 64-68, 74, 85-92, 99-101, 123, 132; HSAC ¶¶ 66-70, 76, 87-94, 101-103, 125, 134. These allegations, which are drawn from vigorously disputed defenses and counterclaims asserted in Merck’s litigation against Glenmark, fully satisfy the pleading requirements for a *Walker Process* fraud claim. *See Lipitor*, 868 F.3d at 249, 267.

**a. Merck Committed Fraud on the PTO by Intentionally Withholding Material Prior Art.**

Contrary to Defendants' suggestion, Mot. at 25-27, Plaintiffs' monopolization claims do not turn on whether Merck disclosed the prior art WO'048 application to the PTO during prosecution of the RE '721 patent. Instead, Plaintiffs allege that Merck knew, based on its own scientific studies, that a particular compound disclosed in WO'048 (SCH48461) inherently produced certain metabolites and metabolite-like analogues claimed in the RE '721 patent, but Merck intentionally withheld that information from the PTO. CAC ¶¶ 64-68, 88-90; HSAC ¶¶ 66-70, 90-92.

Based on the allegations in the Complaints, which must be accepted as true, there can be no real question that the withheld information was material to patentability. Had the examiner been provided with the identified metabolite studies showing that the claimed compounds are necessarily produced when SCH48461 is metabolized—revealing that WO'048 inherently anticipated at least some of the claims—the RE '721 patent would not have issued with the same claims, if at all (*e.g.*, the examiner may have found even the non-anticipated claims to be obvious in view of the metabolite studies). *See* CAC ¶¶ 64-68, 88-92; HSAC ¶¶ 66-70, 90-94. Contrary to Defendants' arguments, and consistent with Defendants' own cases, Plaintiffs *did* allege "how the PTO would use [the alleged] prior art … in its evaluation of the [patents at issue]" (*Polaris Indus. Inc. v. Arctic Cat Inc.*, No. 14-

3412, 2015 WL 4636544, at *5 (D. Minn. Aug. 4, 2015)), and *did* explain how and why "the patent[s] would not have issued but for" the alleged omission. *Dippin' Dots, Inc. v. Mosey,* 476 F.3d 1337, 1347 (Fed. Cir. 2007).

Defendants' materiality argument rings particularly hollow given the fact that immediately following their unlawful PFD Agreement with Glenmark, Merck ran to the PTO to seek reissue of the RE '721 patent, canceling the inherently anticipated claims and disclosing the previously withheld metabolite studies. CAC ¶¶ 99-101; HSAC ¶¶ 101-03. These allegations, taken as true and granting all reasonable inferences in Plaintiffs' favor, easily satisfy the materiality requirement for a *Walker Process* fraud claim. *See Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1349 (Fed. Cir. 2007) (finding that intentional failure to disclose material prior art constituted fraud on the PTO).

Defendants argue that Plaintiff's fraud allegation is implausible because Merck purportedly had no obligation to explain all of the details of WO'048 reference to the PTO, Mot. at 27-28, but that argument completely misses the point. Defendants intentionally withheld from the examiner their own studies and scientific papers that would have revealed that the claims they were seeking to patent were invalid in view of their own prior art. CAC ¶ 67; HSAC ¶ 69. It was not sufficient for Defendants to rely on the examiner's ability to figure out what Defendants already knew, particularly while withholding highly material metabolite studies that

they would later disclose during the RE '721 reissue proceedings.[7] *See, e.g.*, *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1235 (Fed. Cir. 2008) (affirming judgment of inequitable conduct based on withholding observations about prior art that were discussed with patent counsel).

Equally infirm is Defendants' argument that Plaintiffs did not plead intent to deceive with sufficient specificity. Mot. at 28-30. Plaintiffs allege that Merck's prosecuting attorneys and inventors knew about the inherent anticipation problem but intentionally withheld that information from the PTO. CAC ¶¶ 64-68, 88-92, 99-101; HSAC ¶¶ 66-70, 90-94, 101-03. These specific factual allegations, taken as true, plausibly establish the requisite intent to deceive. *See, e.g.*, *Hydril*, 474 F.3d at 1349 (reversing dismissal based on sufficiency of intent pleading, which included allegations that patentee knew prior art would preclude patentability).

**b. Merck Committed Fraud on the PTO by Intentionally Failing to Disclose a True Inventor.**

[7] Defendants argue that Plaintiffs' allegations lack sufficient detail because the Complaints did not "allege any facts showing the 'metabolization studies' disclosed 'each and every element' of any specific claim, much less all of the claims," Mot. at 32, but "inherent anticipation" by definition means that each and every element of a claim is disclosed, literally or inherently, by a single prior art reference. *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1342-44 (Fed. Cir. 2018). Likewise, intentional failure to disclose material prior art can constitute fraud on the PTO even if the withheld information is material to only some claims in a patent. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288-89 (Fed. Cir. 2011) (*en banc*) ("[I]nequitable conduct regarding any single claim renders the entire patent unenforceable.").

Plaintiffs further allege that the RE '721 patent is invalid/unenforceable because Merck intentionally failed to disclose an inventor of the patented subject matter, and did so with deceptive intent. CAC ¶¶ 74, 85, 123; HSAC ¶¶ 76, 87, 125. The main thrust of Defendants' argument here is that Judge Linares, who presided over the litigation between Merck and Glenmark, purportedly "rejected this very theory in his bench opinion in the Mylan Litigation." Mot. at 33-34. However, in assessing the sufficiency of Plaintiffs' allegations, the findings in the litigation between Merck and Mylan cannot be held against Plaintiffs, as doing so would be an improper application of collateral estoppel. *See Lipitor*, 868 F.3d at 267-68.

As to the remainder of their inventorship arguments, Defendants cannot reasonably contend that they lack sufficient notice of the basis for Plaintiffs' claim. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) ("[T]he purpose of Rule 9(b) is to provide defendants with fair notice of the plaintiffs' claims.") (cleaned up). It should be readily apparent from the Complaints that Plaintiffs are relying on the same inventorship-based inequitable conduct theory asserted by Glenmark. *See, e.g.*, CAC ¶¶ 85, 90, 123; HSAC ¶¶ 87, 92, 125. In hindsight, Plaintiffs perhaps should have incorporated by reference the relevant allegations from Glenmark's pretrial brief (which was filed under seal) to avoid any dispute over the sufficiency of the pleadings. Nevertheless, the fact that Defendants did not challenge the sufficiency of these allegations in the motion to dismiss they

filed in the MDL underscored Plaintiffs' belief that the Complaints provided Defendants with adequate notice.

#### c. Plaintiffs Should Be Granted Leave to Amend Any Monopolization Allegations the Court Deems Insufficiently Pled.

To the extent the Court determines either of the above "fraud on the PTO" theories are insufficiently pled, Plaintiffs should be given leave to further amend their Complaints to remedy any perceived deficiencies. Federal Rule of Civil Procedure 15(a) instructs that a "court should freely give leave [to amend] when justice so requires." *Accord Westlake Servs., LLC v. Credit Acceptance Corp.*, CV 15-07490, 2015 WL 9948723, at *8 (C.D. Cal. Dec. 7, 2015) (granting leave to amend complaint after dismissing *Walker Process* claims). Here, these allegations are no surprise to Defendants, as they formed the basis for Glenmark's inequitable conduct claims in the litigation that led to the PFD Agreement. Moreover, the present Motion is the first time Defendants challenged the sufficiency of these allegations, as they did not do so in the motion to dismiss they filed in the MDL.

### 2. Plaintiffs Plausibly Pled a Sham Litigation Claim.

Plaintiffs allege that Merck's patent litigation against Glenmark was a sham because Merck asserted a patent that it knew was invalid/unenforceable for an anticompetitive purpose. *See, e.g.,* CAC ¶¶ 123, 132-34, 149-53, 181; HSAC ¶¶ 125, 134-36, 151-55, 183. Nothing more is required for a plausible sham litigation claim.

*See Lipitor*, 868 F.3d at 272 ("[A] plaintiff must show that the defendant's lawsuit was both objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits and an attempt to interfere *directly* with the business relationships of a competitor.") (quotations and citations omitted).

Plaintiffs' allegations here are akin to those found sufficient in *Lipitor*, where the Third Circuit reversed the district court's dismissal of a sham litigation claim.[8] *Lipitor*, 868 F.3d at 272. There, the plaintiffs alleged that Pfizer's patent litigation against Ranbaxy was a sham because Pfizer knew that the asserted patent had been fraudulently procured. *Id.* at 244-45. The district court found that claim implausible primarily because Pfizer ultimately prevailed on Ranbaxy's inequitable conduct claim, but the Third Circuit held that relying on the outcome in the Pfizer-Ranbaxy litigation was an improper application of collateral estoppel. *Id.* at 267-271. The same rationale applies here. *See, e.g.,* Mot. at 36-37.

#### 3. Plaintiffs Adequately Allege that Defendants Misused the Orange Book for an Anticompetitive Purpose.

[8] Defendants rely heavily on *Wellbutrin*, where the Third Circuit focused its inquiry on whether the defendants "could have perceived some likelihood of success in their case at the time of filing." *Wellbutrin*, 868 F.3d at 150 (quotation omitted). However, the issue in that case was whether, based on the limited information available in the defendants' ANDA filing, it was reasonable for the plaintiff to believe its patent was infringed. *Id.* Here, by contrast, Plaintiffs' allegations are based on what Merck knew about the invalidity/unenforceability *of its own patent* when it sued Glenmark.

Plaintiffs allege that Merck misused the Orange Book by listing patents for Zetia and Vytorin that it knew were invalid/unenforceable or did not cover those products, with the aim of monopolizing the market for ezetimibe. CAC ¶¶ 71-80; HSAC ¶¶ 73-82. Defendants argue that Plaintiffs' theory fails because the underlying *Walker Process* claims regarding the RE '721 patent are implausible, Mot. at 37-38, but Defendants are wrong for the same reasons discussed above in Section III.B.1.

**4. Plaintiffs Adequately Allege that Defendants Engaged in a Monopolistic Scheme.**

"If a plaintiff can allege that a series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions, as an overall scheme, may trigger antitrust liability." *In re Gabapentin*, 649 F. Supp. 2d at 359. Here, Plaintiffs allege that Defendants engaged in a monopolistic scheme by: (i) fraudulently failing to disclose prior art and misrepresenting the true inventors of the RE '721 patent; (ii) listing patents in the Orange Book knowing they were invalid/unenforceable or did not cover the product for which they were listed; (iii) prosecuting a baseless patent infringement suit against Glenmark; and (iv) entering into the unlawful PFD Agreement. CAC ¶¶ 149-153, 233; HSAC ¶¶ 151-155, 235. In seeking dismissal of this claim, Defendants merely cross-reference their earlier arguments regarding the individual grounds. Mot. at 38-39. For the same reasons discussed in Sections III.A.1-3. above,

Defendants' arguments fail—Plaintiffs plausibly allege the various anticompetitive acts of Defendants underlying their monopolistic scheme claim. *See Lipitor*, 868 F.3d at 274 (reversing dismissal of monopolistic scheme claim because underlying claims for *Walker Process* fraud, false Orange Book listing, and sham litigation were adequately pled).

### C. Plaintiffs Adequately Allege that Merck and Schering Conspired to Monopolize the Market for Zetia.

Plaintiffs' allegations that Merck and Schering conspired to monopolize the market for Zetia are well-pled. Defendants contend that Plaintiffs do not adequately allege an agreement between Merck and Schering or allege that Merck had a specific intent to monopolize, Mot. at 39-40, but both arguments fail.

The Complaints are rife with facts "plausibly suggesting a unity of purpose, a common design and understanding, or a meeting of the minds." Mot. at 39-40 (quoting *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010)). The alleged facts show that even before their merger, Merck and Schering worked together in pursuit of the common goal of obtaining and maintaining an unlawful monopoly in the markets for Zetia and Vytorin:

- Merck and Schering entered into a joint venture in 2000 to develop and market cholesterol-lowering drugs, including Zetia (CAC ¶ 56 & n.10; HSAC ¶ 58 & n.7);
- Merck and Schering filed a New Drug Application ("NDA") with the FDA, which in various places referred to Merck entities, Schering entities, or "Merck/Schering-Plough Pharmaceuticals" (CAC ¶ 57; HSAC ¶ 59);

- During the Zetia NDA approval process, FDA staff corresponded with personnel from both Merck and Schering (CAC ¶ 57; HSAC ¶ 59);
- Merck and Schering agreed prior to merging that they would "equally share development and promotional costs for Zetia" and would also "equally share[] profits on Zetia (and later Vytorin) in the U.S., with the exception of the first $300 million on Zetia, for which Schering-Plough received a greater share of the profits" (CAC ¶ 58; HSAC ¶ 60);
- Schering's prosecution of patents covering Zetia and Vytorin was done in furtherance of Merck and Schering's joint venture (CAC ¶ 64 & n.12; HSAC ¶ 66 & n.9);
- Merck, Schering, and MSP Singapore engaged in extensive improper conduct in obtaining the '115 and RE '721 Patents (CAC ¶¶ 65-68; HSAC ¶¶ 67-70); and
- Schering and MSP Singapore sued Glenmark for infringement of the RE '721 patent and Schering was a plaintiff in other patent actions related to Zetia and Vytorin because "[a]s the other member of the joint venture, Schering had a vested economic interest in Merck's ability to maintain its monopolies over these drugs" (CAC ¶ 84 & n.13; HSAC ¶ 86 & n.10).

Such allegations are more than sufficient to support a reasonable inference establishing Merck and Schering's unity of purpose, common design and understanding, or meeting of the minds.[9]

---

[9] Plaintiffs' allegations here are nothing like those found deficient in *Howard Hess*, the case on which Defendants principally rely. There, plaintiffs alleged an elaborate "hub-and-spoke" conspiracy where rival dealers of artificial teeth allegedly conspired with one another through a manufacturer. *See Howard Hess*, 602 F.3d at 255. Lacking were any allegations that the dealers actually conspired with one another, and plaintiffs instead stated only that the dealers were "aware" of the other dealers' involvement in the conspiracy. *Id.* Here, Plaintiffs allege extensive direct communication and coordination between Merck and Schering in service of their common anticompetitive objective. *See, e.g.*, CAC ¶¶ 56-58, 64-68, 84; HSAC ¶¶ 58-60, 66-70, 86.

Plaintiffs also adequately allege that Merck and Schering "intended to achieve an illegal monopoly." *Howard Hess*, 602 F.3d at 257. Intent in this context "may be inferred from a defendant's unlawful conduct." *Suboxone*, 2017 WL 4910673, at *16. Here, the extensive allegations of unlawful conduct in the Complaints support a reasonable inference that Defendants specifically intended to unlawfully establish a monopoly in the market for Zetia. *See, e.g.*, CAC ¶¶ 64-80; HSAC ¶¶ 66-82.

These detailed factual allegations are not, as Defendants complain, merely "conclusory statements." Mot. at 41. Rather, they are the same, in content and specificity, as those in *Suboxone*, where the court concluded that plaintiffs adequately alleged a conspiracy to monopolize between two companies involved in the development and marketing of an opioid addiction drug. 2017 WL 4910673, at *16-17. There, as here, plaintiffs alleged that the defendants actively strategized and coordinated in developing the relevant product and collaborated in submitting applications to the FDA in furtherance of their monopolistic goals. *See id.* at *17. Such allegations "permit the plausible inference" that Defendants "consciously committed to the common scheme of endowing illegal monopoly power" in Merck and "benefitting from such monopoly power." *Id.*

### D. Plaintiffs' State Law Claims Are Adequately Pled.

#### 1. Plaintiffs' State Law Claims are Properly Enumerated.

Defendants ask the Court to dismiss all of Plaintiffs' state law claims on the basis they are "improperly enumerated." Mot. at 41-42. Defendants are incorrect. The Complaints allege extensive facts detailing Defendants' unlawful conduct, describing Plaintiffs' resulting injuries, and identifying the causes of action under which Plaintiffs seek to recover—the Federal Rules' notice-pleading regime requires no more. *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007). It is not necessary for a complaint to "plead law or match facts to elements of legal theories." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 705 (7th Cir. 2023) (citing *Johnson v. Shelby*, 574 U.S. 10 (2014); *Swierkiewicz v. Sorema N.A*, 534 U.S. 506 (2002)). Thus, courts routinely permit plaintiffs to plead claims under the laws of multiple states in the same way that Plaintiffs have here. *See, e.g.*, *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 633-34 (N.D. Cal. 2020) (rejecting argument that plaintiffs' consumer protection claims were conclusory because the complaint was "clear about what wrongdoing has allegedly been committed by [the defendant]").

In support of their sweeping dismissal demand, Defendants cite a single district court case from another circuit. *See* Mot. at 41-42 (citing *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015)). *Aggrenox*'s holding is

inconsistent with federal pleading requirements and has been expressly repudiated by other district courts. *See e.g., See Batton v. Nat'l Assoc. of Realtors*, No. 21-cv-00430, 2024 WL 689989, at *6 (N.D. Ill. Feb. 20, 2024) (declining to follow *Aggrenox*). In *Batton*, the court explained that "[i]n arguing that Plaintiffs fail[ed] to plead their state-law claims adequately, Defendants implicitly suggest that the complaint be evaluated under the standards of code pleading" but "the notice pleading system established by the Federal Rules of Civil Procedure does not require such level of detail." *Id.* For the same reason, Plaintiffs' state law claims should be permitted to proceed.

#### 2. ***Illinois Brick*** **Does Not Bar Plaintiffs' Montana Antitrust Claims.**

Defendants argue that Plaintiffs' claims under the Montana Unfair Trade Practices Act ("MUTPA") fail because Montana follows *Illinois Brick*. Mot. at 42-43. A Montana court expressly rejected this same argument in *Olson v. Microsoft Corp.*, No. 2000-219, 2001 WL 36083237 (Mont. Dist. Ct. Feb. 15, 2001) (concluding "[b]ased on the plain language of the statute" that "the *Illinois Brick* rule [prohibiting antitrust claims by indirect purchasers] does not apply to the Montana [Unfair Trade Practices Act]"); *see also In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*, No. 21-12061, 2023 WL 2182046, at *11 (D.N.J. Feb. 23, 2023) (noting *Olson*'s holding that *Illinois Brick* does not apply to Montana's

Uniform Trade Practices Act and denying motion to dismiss indirect purchasers' Montana unjust enrichment claims).[10]

### 3. Humana Has Standing to Assert Claims Under the Utah Antitrust Act.

Plaintiffs do not dispute that the Utah Antitrust Act only permits private civil suits by Utah citizens or residents, Utah Code § 76-10-3109, which is why Humana expressly alleges that it is pursuing Utah antitrust claims only insofar as Humana and its claim assignors are "citizens of Utah." *See* HSAC ¶ 191(y). Defendants' contention that "Plaintiffs are not citizens of Utah" is incorrect, or at least overbroad. As alleged in the HSAC, Humana is asserting claims in this lawsuit for itself, as well as for various Humana subsidiaries that have been specifically identified in the HSAC and have assigned their claims to Humana. *See* HSAC ¶ 9 & n.3. Among those subsidiaries is Humana Medical Plan of Utah, Inc. *Id.* Thus, Humana's Utah antitrust claims should proceed. *See Staley v. Gilead Scis., Inc.*, 589 F. Supp. 3d 1132, 1144 (N.D. Cal. 2022) (denying dismissal of Utah antitrust claim where plaintiff was assigned claims of a Utah subsidiary).[11]

---

[10] Defendants' cases do not hold otherwise. In *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 22 (D. Mass. 2004), the court did not address or discuss *Olson* and undertook no specific analysis of Montana law.

[11] Centene acknowledges that the CAC does not currently identify a plaintiff or assignor that is a Utah citizen or resident, and thus agrees that its claims under the Utah Antitrust Act may be dismissed.

#### 4. Plaintiffs Have Adequately Pled Consumer Protection Claims Under the Laws of Colorado, North Dakota, Pennsylvania, and Wisconsin.

Plaintiffs' claims under the consumer protection laws of Colorado, North Dakota, Pennsylvania, and Wisconsin law are adequately pled. Defendants argue these laws require challenged conduct to "relate to a consumer transaction or target consumers," and that the Complaints fail to meet that requirement because Plaintiffs' allegations relate only to "generic drug manufacturers, the PTO, and the FDA." Mot. at 44. Defendants are incorrect for a number of reasons.

First, Plaintiffs allege that Defendants inflated prices for "drugs dispensed to members," *see, e.g.*, CAC ¶ 225; HSAC ¶ 227, who are indisputably consumers. Health plans such as Plaintiffs are effectively consumers when they pay for the drugs dispensed to their members because those payments cannot be divorced from the transaction. CAC ¶¶ 9-12; HSAC ¶¶ 9-10 ("[W]hen any of Humana's members filled a prescription of Zetia, Vytorin, or their generic equivalents at a pharmacy, Humana—through its various health plans—has paid a large share of the cost of those drugs.").

Second, Plaintiffs expressly allege that, among other forms of deceptive and unlawful conduct, Defendants entered into an anticompetitive settlement agreement that was hatched in secret, maintained through deception, and caused Defendants' drugs to be dispensed to consumers at inflated prices without Plaintiffs' (or

Plaintiffs' members') awareness. *See* CAC ¶¶ 110-12; HSAC ¶¶ 112-14. The consumer protection statutes at issue here do not require more:

- **Colorado**: *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 224 (S.D.N.Y. 2012) (noting that the *Sheet Metal* court did not cite any Colorado authority for an "aimed at consumers" requirement and finding that there was "[no] basis in caselaw" for its unsupported narrowing of the CCPA); *In re Generic*, 338 F. Supp. 3d at 846.

- **Pennsylvania**: *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021) (noting the consumer protection law "is to be construed liberally with the object of preventing unfair or deceptive practices"); *Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 457 (1974) ("The Legislature sought by the Consumer Protection Law to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices[.]").

- **North Dakota**: N.D. Cent. Code § 51-15-02 (prohibiting "any act or practice" which "causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition"); *In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 846 (E.D. Pa. 2019).

- **Wisconsin**: *In re Generic*, 368 F. Supp. 3d at 846 (finding comparable allegations of end-payor plaintiffs in price-fixing case sufficiently alleged "deceptive and/or unconscionable conduct," and therefore denying motion to dismiss Colorado, North Dakota, and Wisconsin consumer protection claims).

Therefore, the Court should deny Defendants' Motion to Dismiss Plaintiffs' Colorado, North Dakota, Pennsylvania, and Wisconsin consumer protection claims.

### 5. Plaintiffs' Claims Do Not Circumvent *Illinois Brick*.

Defendants argue that Plaintiffs' claims under the consumer protection laws of Louisiana and Indiana, as well as its unjust enrichment claims under the common law of Delaware, Georgia, Kentucky, Louisiana, New Jersey, Oklahoma, Pennsylvania, Texas, Virginia, Washington, and Wyoming, improperly

"circumvent" *Illinois Brick* and must therefore be dismissed. Mot. at 44-45. Again, Defendants are incorrect.

***Louisiana & Indiana Consumer Protection Claims.*** Defendants make the bare assertion that *Illinois Brick* compels dismissal of Plaintiffs' claims under the Indiana Deceptive Consumer Sales Act ("IDCSA") and the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"). Mot. at 44. This same argument has been rejected by numerous courts. For example, in *In re Generic*, the court refused to dismiss plaintiffs' state consumer protection claims on the basis that they were merely "repackaged federal antitrust claims" that purportedly were being used "to circumvent the *Illinois Brick* prohibition on indirect purchaser claims." 368 F. Supp. 3d at 840-41. The court explained that defendants' "repackaging argument" did not compel dismissal because "states remain free to permit recovery by indirect purchasers." *Id.* at 840. Defendants even raised the same argument in the Zetia MDL with respect to the end-payor plaintiff class's claims under Missouri law, and the MDL court correctly rejected the argument. *See In re Zetia*, 2019 WL 1397228, at *28; *see also In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1080 (S.D. Cal. 2017) ("just because the same course of conduct gives rise to recovery under two distinct statutory provisions does not mean that a bar to recovery

under one necessarily applies with equal force to the other”).[12] Defendants’ Motion to Dismiss Plaintiffs’ IDCSA and LUTPA claims therefore should be denied.[13]

***State Unjust Enrichment Claims.*** Defendants similarly argue that Plaintiffs are precluded from pursuing unjust enrichment claims under the laws of states that have not repealed *Illinois Brick.* Mot. at 44-45. This argument again fails. Defendants’ position that *Illinois Brick*’s limitations on antitrust standing extend to common law unjust enrichment claims under state law has been rejected by numerous courts. *See, e.g.*, *In re Generic*, 368 F. Supp. 3d at 849-50 (“No reason or logic supports a conclusion that a state’s adherence to the rule of *Illinois Brick*

[12] It would be inconsistent with the broad remedial purposes of the consumer protection statutes here to deny recovery based on a standing limitation governing federal antitrust law. *See Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 332 (Ind. 2013) (explaining that the IDCSA is meant to be “liberally construed and applied to promote its purposes and policies of protecting consumers from deceptive or unconscionable sales practices”) (internal quotations omitted); *Copeland v. Treasure Chest Casino, L.L.C.*, 822 So.2d 68, 71 (La. Ct. App. 2002) (LUPTA covers practices that are “unethical, oppressive, unscrupulous, or substantially injurious to consumers or business competitors”).

[13] The cases cited by Defendants are inapposite. For instance, *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 435 (E.D. Pa. 2010), does not address the applicability of *Illinois Brick* to the IDCSA. The ruling *In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516, 2016 WL 4204478, at *4 (D. Conn. Aug. 9, 2016) was based on the court’s determination that Louisiana courts had not issued an “authoritative statement” that *Illinois Brick* did not apply to Louisiana’s antitrust law, and by extension, LUPTA. This conclusion is refuted by the court’s observation in *Staley*, based on a thorough review of Louisiana law, that LUPTA is meant to serve a broad remedial purpose and that claims substantially similar to those alleged here should be permitted to proceed. *See Staley*, 589 F. Supp. 3d at 1136-1140.

dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy.") (quoting *In re G-Fees Antitrust Litig.*, 584 F. Supp. 3d 26, 46 (D.D.C. 2008)).

Based on this reasoning, courts have declined to dismiss unjust enrichment claims simply because a particular state has not repealed *Illinois Brick*. *See In re Generic*, 368 F. Supp. 3d at 849-50 (denying motion to dismiss unjust enrichment claims under Delaware, Georgia, Kentucky, Louisiana, New Jersey, Oklahoma, Pennsylvania, Texas, Virginia, Washington, and Wyoming law); *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d at 46 (denying motion to dismiss unjust enrichment claims based on "a state's adherence to the rule of *Illinois Brick*," including unjust enrichment claims under New Jersey, Pennsylvania, and Texas law). The Court should deny dismissal of Plaintiffs' unjust enrichment claims.

### 6. Plaintiffs Have Adequately Pled Mississippi and Missouri Consumer Protection Claims.

Defendants seek dismissal of Plaintiffs' claims under the Missouri Merchandising Practices Act ("MMPA") and the Mississippi Consumer Protection Act ("MCPA") because Plaintiffs purportedly did not purchase Zetia or Vytorin "for personal, familial, or household use." Mot. at 45. Defendants are incorrect.

It is beyond reasonable dispute that Plaintiffs' damages arise from payments for Zetia and Vytorin dispensed to their members for personal use. This is sufficient

to confer standing, as the MMPA does not require the party asserting a claim to personally use the product. Missouri's Supreme Court has recognized that the statute allows "any person who has suffered any ascertainable loss . . . resulting from the violator's prohibited conduct" to sue. *Gibbons v. Nuckolls, Inc.*, 216 S.W. 3d 667, 669–70 (Mo. 2007); *see also, e.g.*, *Missouri v. Polley*, 2 S.W.3d 887, 892 (Mo. Ct. App. 1999); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d at 639 ("[A]n insurer who purchases a pharmaceutical product essentially acts as a proxy for its insured"); *In re Generic*, 368 F. Supp. 3d at 847, n.156.

Plaintiffs' claims are explicitly predicated on monetary losses they directly suffered for Vytorin prescriptions personally used by their members. Plaintiffs pay for their members' prescriptions at the time of dispensing for their members' personal use. *See* CAC ¶ 9; HSAC ¶ 9; *see also Mayor & City Council of Baltimore*, 2023 WL 8018980 at *16 (E.D. Pa. Nov. 20, 2023) (concluding that a health plan's transitory purchases of vaccines for its members' personal use was sufficient to establish a claim under the MMPA); *cf. In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 495 F. Supp. 2d 1027, 1034 (N.D. Cal. 2007) (noting there was "no serious dispute" that transactions giving rise to claims by health plans "were primarily for personal purposes, that is, the personal use of the patients," in case involving Michigan consumer law).

Given their role in paying for drugs dispensed for the personal use of their members, courts have repeatedly permitted third-party payors like Plaintiffs to bring MMPA claims against drug manufacturers. *See Staley*, 446 F. Supp. 3d at 640 (denying motion to dismiss MMPA claim and finding that "the absence of legislative history indicating that a consumer is restricted to one who purchases for his, her, or its own use" weighs in favor of third-party payor claims); *In re Generic*, 368 F. Supp. 3d at 847 (denying motion to dismiss MMPA claim); *In re Opana ER Antitrust Litig.*, No. 14 C 10150, 2016 WL 4245516, at *4 (N.D. Ill. Aug. 11, 2016) (same); *see also Picone v. Shire PLC*, No. 16-cv-12396, 2017 WL 4873506, at *17 (D. Mass. Oct. 20, 2017) (finding that "the Missouri Supreme Court would likely permit MMPA claims by indirect purchasers and therefore will not dismiss the MMPA claims on these grounds"). This Court should do the same.

Other courts have likewise concluded that third-party payors such as Plaintiffs may assert claims under the MCPA. *See Staley*, 589 F. Supp. 3d at 1141 (finding "an insurer, standing in as a proxy for the end user, not as an independent buyer in the business of reselling the product as a retailer or distributor," was purchasing the product for personal use and could bring an MCPA claim); *see also In re Generic*, 368 F. Supp. 3d at 847 (emphasis added) (denying motion to dismiss, finding insurer transactions are consumer transactions "*made for the personal purposes of the patient,*" and noting that insurers "do not purchase drugs for resale, distribute

products or act as intermediaries in the distribution chain”); *In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 842 (Miss. 2015) (affirming trial court’s rejection of argument that the state is not a consumer for purposes of the MCPA, because “the State is the ultimate purchaser in the chain of distribution and the one directly affected by the alleged manipulation of the [drug price]”). Defendants’ Motion to Dismiss the MCPA claim should be denied.

### 7. Plaintiffs Have Adequately Pled Wyoming Consumer Protection Claims.

In arguing that Plaintiffs’ claims under the Wyoming Unlawful Practices Act (“WUPA”) should be dismissed, Defendants disregard the plain language of the statute. The WUPA provides that “[a] person engages in a deceptive trade practice unlawful under this Act when, in the course of his business and in connection with a consumer transaction, he knowingly: engages in unfair or deceptive acts or practices.” Wy. St. § 40-12-105(a)(xv). This language is broad enough to encompass Defendants’ alleged misconduct here. Plaintiffs allege that Defendants unlawfully monopolized the market for Zetia and Vytorin, and their PFD Agreement and other actions inflated the cost of drugs taken by Plaintiffs’ members. CAC ¶¶ 149-153; HSAC ¶¶ 151-155. Defendants have failed to demonstrate that the Wyoming legislature or any Wyoming court has limited the WUPA’s reach in the manner Defendants urge the Court to do here. The sole authority cited by Defendants fails to identify any controlling authority that prohibits the type of claims asserted here.

*See In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1119-20 (N.D. Cal. 2007). Accordingly, Plaintiffs' WUPA claims should be permitted to proceed.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs request the Court deny Defendants' Motion in its entirety. Nevertheless, to the extent the Court deems any of Plaintiffs' claims to be inadequately pled, Plaintiffs request leave to further amend their Complaints to remedy any perceived deficiencies.

[*signature page follows*]

Dated: April 12, 2024

*<u>/s/ Stephen V. Gimigliano</u>*
Stephen V. Gimigliano
Robert W. Mauriello, Jr.
Joshua A. Druck
GIMIGLIANO MAURIELLO & MALONEY
A Professional Association
163 Madison Avenue, Suite 500
P.O. Box 1449
Morristown, New Jersey 07962-1449
(973) 946-8360

Preetha Chakrabarti
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 223-4000
PChakrabarti@crowell.com

Daniel A. Sasse (*pro hac vice*)
Tiffanie L. McDowell (*pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
(949) 263-8400
DSasse@crowell.com
TMcDowell@crowell.com

Mark M. Supko (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500
MSupko@crowell.com

*Attorneys for Plaintiffs Centene Corporation, Wellcare Health Plans, Inc., New York Quality Healthcare Corporation dba Fidelis Care, and Health Net, LLC*